**Robert COOPER, dba Amarillo Aeration & Temperature Co., Appellant,**

v.

**KRUSE–REED, INC., Appellee.**

No. 8753.

Court of Civil Appeals of Texas, Amarillo.

July 18, 1977.

Folley, Snodgrass & Calhoun, O. M. Calhoun, Amarillo, for appellant.

La Font, Tunnell, Formby, La Font & Hamilton, Thomas E. Hamilton, Plainview, for appellee.

ELLIS, Chief Judge.

Kruse-Reed, Inc. brought this action for damages based on an alleged breach of contract for the sale and installation of a grain dryer against Robert Cooper, d/b/a Amarillo Aeration & Temperature Co. Cooper denied breaching the agreement and counterclaimed against Kruse-Reed for an alleged anticipatory breach and for damages based on anticipated profits. Judgment was rendered on a jury verdict favorable to Kruse-Reed. In his appeal, Cooper has challenged the evidentiary support for the jury's finding of breach and the damages assessed against him. We have concluded that sufficient evidence of probative force was submitted to support the jury's findings as to breach and for the determination of the damages sustained. Affirmed.

Kruse-Reed, Inc., is a general construction contractor with James Kruse and L. F. Reed each owning 50% of the stock in the corporation. During the summer of 1973, it let subcontracts to Cooper for installation of grain dryers at two jobsites. One of these was at Hart Camp, Texas; the other was at Hill Feedlot in Dimmitt, Texas. The Hill Feedlot contract is the agreement primarily involved in this suit.

The Hill Feedlot contract called for construction of a 550 column dryer rated at 1500 bushels per hour. The dryer was to be delivered, wired and plumbed "as soon as possible." Payment terms were 80% upon delivery of the dryer to the jobsite, 20% upon completion. The agreed price was $36,500.00. The contract was confirmed in writing and the confirmation was signed on August 21, 1973. On that day, the concrete had been poured to meet the specifications of the dryer ordered. The parties apparently had contemplated that the dryer would be installed that fall, but Cooper failed to do so. On May 24, 1974, Cooper notified Kruse-Reed of his refusal to erect the dryer.

The project was completed without Cooper's dryer. Kruse-Reed purchased a substitute dryer in Saginaw, Michigan, and transported it to the Hill Feedlot. This suit for breach of contract was instituted in December, 1974, and tried to a jury in April, 1976. Both contracting parties claimed damages for the other's alleged breach.

The jury found that Cooper had breached the contract and assessed Kruse-Reed's damages at $19,200.00. L. F. Reed was found not to have stated that he was not

"putting any more money" into the construction of the Hill Feedlot job. At the trial, Cooper had claimed that Reed had made this statement and that such statement constituted a repudiation of the contract. The jury found that Cooper was entitled to no damages. Judgment for Kruse-Reed was rendered for the amount of the verdict plus prejudgment interest from May 24, 1974. Cooper has appealed on four points of error.

In his first point, Cooper contends that the evidence produced was legally and factually insufficient to sustain a finding that he breached the contract. In his second point, Cooper contends that the jury's finding, in response to special issue 2, that L. H. Reed did not state that he was not "putting any more money" into the Hill Feedlot job is against the great weight and preponderance of the evidence. The statement was alleged to have been made on September 4, 1973, when Cooper sent Hines, his agent, to present Kruse-Reed with an invoice on the Hart Camp job. According to Hines, Reed reacted by stating unequivocally that "he was not going to put anymore (sic) money" into the Hill Feedlot job. Reed testified that he told Hines that "until Jim Kruse got out of the hospital there wasn't going to be anything done." According to Reed, he did tell Hines, in effect, that he would not pay the bill then, but would defer payment until Jim Kruse had authorized the payment. Reed also testified that he was referring only to the Hart Camp job when he had this conference with Hines.

The evidence showed that in August, 1973, the parties contracted for a dryer to be erected "as soon as possible" at the Hill Feedlot job. Cooper argues that on September 4, 1973, he was prepared to deliver the dryer and L. H. Reed was informed of this fact. Cooper contends that Reed had refused to put any more money into the job. Cooper has taken the position that his readiness to perform constituted an offer or an attempt to perform and that Reed's alleged refusal to pay frustrated his efforts to comply with the terms of the contract, i. e., to deliver "as soon as possible." According to

Cooper, Kruse-Reed should not be allowed to recover damages because Cooper's performance was rendered impossible by Reed's alleged refusal to pay. In our opinion, the evidence does not establish that Cooper was frustrated or impeded in any attempt to perform the contract.

The dryer was to have been installed in September or October, 1973. In September, Kruse notified Cooper he was ready for delivery of the dryer. Cooper informed Kruse that he was having trouble getting perforated metal for screens to be used in the dryer. Also, Cooper contended he could not install the dryer because Kruse-Reed had equipment and material at the jobsite which would interfere with the installation of the dryer, while Kruse-Reed contended that the material and equipment would not interfere with the installation. After October 5, however, nothing at the jobsite would have impeded Cooper's work, and Kruse-Reed repeatedly urged Cooper to install the dryer. After it became obvious that the dryer would not be installed in time to dry the 1973 corn harvest, Cooper was told that he could erect the dryer in his spare time during 1974. Cooper apparently acquiesced in these terms because he did not protest them in any conversations he had with Kruse during the early part of 1974. Finally on May 24, 1974, Cooper advised Reed of his absolute refusal to erect the dryer. Cooper did not erect the dryer and Kruse-Reed purchased another dryer elsewhere. In our opinion, there is sufficient evidence of probative force to support the jury finding that Cooper breached the contract. Point 1 is overruled.

With respect to the second point, there was conflicting testimony concerning Reed's conversation with Hines regarding the matter of the plaintiff's plans to put more money into the Hill Feedlot job. The jury could have believed Hines' version that Reed unequivocally refused to put more money into the Hill Feedlot job. Alternatively, the jury could have believed Reed's representation to the effect he refused to pay Cooper's bill only until Jim Kruse got out of the hospital to inspect the materials

and the job as was customary in their method of conducting the business. The jury could also have believed Reed when he testified that his statements concerned only the Hart Camp job. In our opinion, the finding that Reed did not make the statement that he was not "putting any more money" into the construction of the Hill Feedlot job is not against the great weight and preponderance of the evidence. Point 2 is overruled.

In his third and fourth points, Cooper has argued that the evidence was legally and factually insufficient to support submission of the damage issue to the jury or to support the jury's finding on that issue. The damage issue was submitted in the following form:

"SPECIAL ISSUE NO. _4_

"What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Kruse-Reed, Inc. for the damages sustained by it, if any, as a result of the breach of contract, if any, by Robert Cooper?

"Answer in Dollars and Cents.

"ANSWER: $_____.

"You are instructed that the amount of damages, if any, sustained by Kruse-Reed, Inc. is the difference between the contract price and the reasonable and necessary actual expense incurred by Kruse-Reed, Inc. to purchase and erect a grain dryer at the Hill Feedlot in compliance with the terms of the contract entered into between the parties."

The jury answered: $19,200.00.

The evidence established the contract price of the dryer to be $36,500.00. Records and testimony from Jim Kruse established that Kruse-Reed purchased a substitute dryer and installed it for $74,924.90. Kruse testified that this amount (broken down into various component costs) was reasonable and necessary. Also admitted into evidence was the fact that, just prior to his May 24, 1974 repudiation, Cooper had contracted to sell a similar dryer for a substantially higher price than he charged Kruse-Reed.

In his discussion of points 3 and 4, Cooper has contended that the measure of damages in this case should have been the difference between the contract price of the dryer and the market value of the dryer at the time and place of breach. However, Cooper neither requested other instructions nor objected to the charge as submitted. Because no objection was made, any complaint as to the measure of damages submitted was waived. Tex.R.Civ.P. 272, 274, 279; *Stuckey v. Union Mortgage & Investment Company*, 383 S.W.2d 429 (Tex.Civ. App.—Tyler 1964, writ ref'd n. r. e.). Furthermore, even assuming the complaint had not been waived, it would not be well founded. The correct measure of damages should have compensated Kruse-Reed for the reasonable cost of substitute goods actually purchased less the contract price. Tex.Bus. & Comm.Code Ann. § 2.712 (1968). The evidence shows that the purchase of the substitute dryer and additional expenses incident to the installation of the equipment was made necessary as a result of the failure of Cooper to install the dryer as agreed. In our opinion, under the circumstances of this case, a correct measure of damages was employed and we find no reversible error with respect to the issue submitted and the instructions given to the jury for its guidance in determining the damages sustained by Kruse-Reed.

Cooper had also argued that the contract called for a used dryer and the one purchased as a substitute was a new dryer. In his brief, Cooper has admitted that the written contract did not expressly call for a used dryer, but he testified that the dryer was, in fact, to be a used dryer. Cooper has argued that Kruse-Reed had notice that he only sold used dryers and therefore, the contract must have been for a used dryer. Cooper admitted, however, that he built and installed new dryers as well as used ones. James Kruse testified that the August 21, 1973 contract was for a "new dryer." The jury was entitled to believe Kruse over Cooper and his testimony supports the finding that the parties anticipated the furnishing of a new dryer.

As part of his discussion under points 3 and 4, Cooper has argued that the new dryer purchased was different from the one he contracted to sell. The testimony, however, indicated that the substitute dryer was very similar to the one Cooper had contracted to sell. The dryers had the same capacity and similar components. Even though the substitute dryer required a different concrete slab, this was not so great a difference as to make the substitute purchase unreasonable. The testimony showed that Kruse-Reed was laboring under a strict time restraint; the dryer had to be installed in time for use on the 1974 harvest. According to the evidence, the dryer purchased represented the best value available on short order.

Lastly, Cooper has questioned the qualifications of James Kruse to testify as to the reasonableness of the cost of the substitute dryer. The determination as to whether a witness is qualified to testify rests within the discretion of the trial court and its decision will not be overturned except upon showing an abuse of discretion. *Hodges v. State,* 403 S.W.2d 207 (Tex.Civ. App.—Texarkana 1966, writ ref'd n. r. e.). In the case before us, Kruse testified that he had been in the dryer installation and related businesses for many years. He testified that he was familiar with the fair market values of dryers in Castro County. In our opinion, the trial court did not abuse its discretion in admitting his testimony.

In the light of the foregoing, it is our opinion that there was sufficient evidence of probative force for the jury to ascertain the damages sustained by the plaintiff and to support the jury's findings as to the amount of such damages. Points 3 and 4 are overruled.

For the reasons above stated, the judgment of the trial court is affirmed.